# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

**XAI BEE MOUA,**

            Plaintiff,

      v.

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

            Defendant.

Civil No. 04-2635 (MJD/JGL)

**REPORT AND**
**RECOMMENDATION**

---

## APPEARANCES

Laura Susan Melnick, Esq., Southern Minnesota Regional Legal Services Attorney, on behalf of Plaintiff Xai Bee Moua

Lonnie F. Bryan, Esq., Assistant U.S. Attorney, on behalf of Defendant Jo Anne B.  Barnhart

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

        Plaintiff Xai Bee Moua commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying him Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3).  This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1(a).  The parties have submitted cross-motions for summary judgment.  For the reasons set forth below, the Court

recommends that the Commissioner be affirmed.

## I.   INTRODUCTION

Plaintiff Xai Bee Moua was fifty-three years old at the time of the decision by the Administrative Law Judge ("ALJ").  (R. at 19.)  Moua is a Hmong Laotian male with a third grade education completed in Laos.  (Id.) Plaintiff joined the military at age thirteen, and has a past medical history of wounds suffered as a soldier fighting for the United States during the Vietnam War.  (Id. at 121, 130, 184, 292.)  In 1964, he was shot in the back and right posterior thigh and suffered shrapnel wounds to his right arm.  (Id. at 121.) Moua reportedly immigrated to the United States in 1985.  (Id. at 130.)  He is unable to communicate in English, and last worked in 1987 as a janitor at a church.  (Id. at 26-27, 292.)  Moua is married and has several children, four of whom live with he and his wife.  Plaintiff is the primary caregiver of his wife, who is disabled after suffering a severe stroke.  Although the family qualifies for state assistance that would provide for an at-home nurse for a period each day, they have refused, leaving Moua as the caretaker.  (Id. at 164, 170.)

Moua applied for SSI on October 25, 2001, alleging disability since October 1, 2001 due to gunshot wounds to his back and right thigh, shrapnel wounds to his right arm, chest pain, weakness, and nightmares.  (Id.

at 19, 59-61, 69.)  The application was denied by the state agency both initially (<u>id.</u> at 29-30, 33-36) and on reconsideration (<u>id.</u> at 31-32, 38-40).  On May 20, 2002, Plaintiff Moua appealed the denial and filed a request for a hearing.  (<u>Id.</u> at 41.)  A hearing was held before ALJ William S. Herbert in Minneapolis on February 19, 2003, at which Moua was represented by counsel and testified on his own behalf through an interpreter.  (<u>Id.</u> at 56, 281-317.)  A medical expert ("ME") and a vocational expert ("VE") also testified. (<u>Id.</u> at 290-91, 294-96, 308-14.)  Plaintiff's son provided additional testimony. (<u>Id.</u> at 301-08.)  On May 15, 2003, the ALJ issued his determination that Moua was not legally disabled because he was able to perform a significant number of jobs existing in the economy.  (<u>Id.</u> at 18-28.)

Under Social Security Administration ("SSA") regulations, a disability determination requires a five-step, sequential analysis:  (1) Has the claimant engaged in substantial gainful activity since the alleged onset of disability?  (2) Is the claimant suffering from a severe impairment?  (3) Does the claimant's impairment meet or equal a listing in the Listing of Impairments?  (4) Does the claimant have the residual functional capacity ("RFC") to perform the claimant's past relevant work?  (5) If the claimant is unable to perform past relevant work, is there any other work in the national economy that he or she can perform?  20 C.F.R. § 404.1520.

In the present case, at step one, the ALJ found that Moua had not engaged in gainful employment at any time during the period of 1987-2002, the only period of records available.  (R. at 19.)  At step two, the ALJ found that the weight of the evidence reflected no physical impairment that would be considered severe under the Social Security Act.  (Id. at 20.)  However, ALJ Herbert found that Moua did suffer from mental impairments – including depression, post traumatic stress disorder ("PTSD"), and an undifferentiated somatic disorder – that moderately restricted his activities of daily living.  (Id. at 22.)  At step three, the ALJ found that Moua's impairments did not meet or equal any of the listed impairments contained in 20 C.F.R. § 404, subpart P, appendix 1.  (Id. at 24.)  There was no step four determination, as Moua had no past relevant work for the ALJ to consider.  (Id. at 26.)

Next, at step five, the burden shifts to the Commissioner to prove that the claimant possesses the RFC to perform other work available in significant numbers.  20 C.F.R. § 404.1520(f).  In making this determination, the ALJ needs to consider the claimant's RFC, age, education, and past work experience.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  At the time of the hearing, Moua was fifty-three years old, defined as a person closely approaching advanced age.  (R. at 19, 26.)  He has a third grade education, is illiterate in English, with no past relevant work experience.  (Id. at 19.)

- 4 -

Because ALJ Herbert found that Moua's mental state somewhat impaired his ability to work, the ALJ modified Moua's RFC accordingly.  (<u>Id.</u> at 26.)  The ALJ found that Moua had the RFC to perform "relatively simple unskilled jobs that are routine and repetitive without frequent changes in directions or duties, without high or demanding production goals, without likely involvement in challenging or dangerous situations, and involve limited brief and superficial contact with supervisors, co-workers and the public."  (<u>Id.</u> at 24.)

The ALJ considered Plaintiff's earnings record when making his credibility determination.  <u>See</u> 20 C.F.R. § 416.929.  ALJ Herbert found that the fact that Moua had never earned more than $100 in a calendar year since immigrating to the United States did not support Moua's contention that if not for his impairments, he would be working.  (R. at 26.)  The ALJ then relied on the testimony of the VE in concluding that a hypothetical person with Moua's age, education, employment history, and RFC could find work in the national economy.  (<u>Id.</u> at 27.)

Plaintiff submitted additional evidence on July 14, 2003 and requested review of the ALJ's decision.  (<u>Id.</u> at 252-80.)  Review was denied on March 18, 2004, rendering ALJ Herbert's decision as the final decision of the Commissioner.  (<u>Id.</u> at 7-9.)  In May 2004, Moua timely filed his case in federal

court.  Plaintiff sought and was granted leave to proceed in forma pauperis.

Moua moved for summary judgment on September 14, 2004, challenging the

ALJ's findings on four grounds: (1) the ALJ improperly discounted the opinion

of the treating psychologist; (2) there is not substantial evidence supporting

the mental illness determinations; (3) the RFC finding was legal error; and (4)

the ALJ's conclusion of non-disability constituted legal error.  After receiving

an extension of time in which to file, the Commissioner moved for summary

judgment on November 9, 2004.

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's final decision, embodied in

ALJ Herbert's determination, is limited to an assessment of whether the

decision is supported by substantial evidence in the record as a whole.  42

U.S.C. § 405(g); Brand v. Sec'y of Dep't of Health, Educ., & Welfare, 623 F.2d

523, 527 (8th Cir. 1980).  In determining whether evidence is substantial, the

Court must consider "evidence that detracts from the Commissioner's decision

as well as evidence that supports it."  Warburton v. Apfel, 188 F.3d 1047, 1050

(8th Cir. 1999).  "Substantial evidence is less than a preponderance, but

enough so that a reasonable mind might find it adequate to support the

conclusion."  Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  If the

Commissioner's decision is based on substantial evidence in the record, the

Court may not reverse it merely because other substantial evidence would have supported a different outcome.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Further, credibility is weighed by the Commissioner, not the Court.  Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir. 1995).

With respect to additional evidence submitted to the Appeals Council, such evidence is only relevant insofar as it is new, material, and describes the claimant's condition prior to the date of the Commissioner's decision.  20 C.F.R. § 404.970(b).  To this extent, the newly submitted evidence becomes part of the "administrative record," even though the evidence was not actually before the ALJ.  Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000).  If, as here, the Appeals Council has considered the new evidence but declined review, the Court reviews the ALJ's determination to assess whether there is substantial evidence in the administrative record as a whole – which now includes the new evidence – to support the determination.  Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992); Cunningham, 222 F.3d at 496-500.  The Appeals Council's decision to not review Moua's case after considering the new evidence is not appealable.  See Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 42 U.S.C. § 405(g).

## III.    DISCUSSION

As noted above, Plaintiff makes four basic contentions regarding

the ALJ's decision:  the ALJ improperly discounted the opinion of a treating psychologist, there is not substantial evidence supporting the ALJ's mental illness determinations, and the ALJ's RFC finding and his conclusion of non-disability constitute legal error.

### A.     The ALJ's Treatment of Psychologist Testimony

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  Moreover, the opinion should be given controlling weight if it is well-supported by medically acceptable clinical and laboratory techniques and is not inconsistent with other substantial evidence in the record.  Id.  If the opinion is conclusory, that is, unsupported by clinical or diagnostic evidence, is not entitled to controlling weight.  E.g., Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996.).  Additionally, a treating physician's opinion may be discounted if the opinion is based on a relatively short-term relationship with the claimant.  See Holmstrom v. Massanari, 270 F.3d 715, 720-21 (8th Cir. 2001).  When a treating physician's opinion is itself inconsistent, it receives less deference.  Id. (citations omitted).  When assessing such an opinion, an ALJ must explain his or her reasons.  Id. at 720 (citations omitted).  The Court finds it appropriate to extend the policy of deference to medical sources like treating psychologists.

In December 2001, psychologist Robert C. Barron, Ph.D., evaluated Plaintiff Moua and administered the Test of Nonverbal Intelligence, Third Edition ["TONI-3"], a non-language, motor reduced, and cultural reduced measure of intellectual functioning requiring abstract or figural problem solving. (R. at 136.) Dr. Barron reported that Moua scored a 92, which equals or exceeds the nonverbal intelligence of 30 % of the general population. (Id.) Dr. Barron also noted that Plaintiff's affective reactions were normal with no obvious clinical or neurovegetative symptoms of depression, no evidence of delusions, hallucinations, thought insertion, thought broadcasting, thought disorders, or ideas of reference. (Id. at 137.) During testing, Moua displayed adequate task orientation, motivation, cooperation, and effort. (Id.)

Plaintiff reported that he had frequent nightmares about war that caused difficulty sleeping, with intrusive thoughts during the daytime and pronounced startle reactions to sudden loud voices. (Id.) Moua also admitted thoughts of suicide without plans or attempts to harm himself. (Id.) Dr. Barron diagnosed Plaintiff with major Depressive Disorder, Single Episode; PTSD, Chronic; and Undifferentiated Somatoform Disorder, and concluded that, on the basis of his cognitive functioning, Plaintiff appeared capable of communicating, comprehending, and retaining simple directions at an unskilled, competitive employment level. (Id. at 138-39.) On the basis of

social and emotional functioning and activities, Dr. Barron concluded that he appeared capable of withstanding work stresses; rapidly performing routine, repetitive activities; and meeting production requirements at an unskilled, competitive employment level unless medically contradicted.  (Id. at 139.)

Three months later, Moua began psychotherapy with licenced psychologist Theresa Voss.  (Id. at 180.)  In her initial evaluation in March 2002, Voss found that Plaintiff struggled with depression, PTSD, feelings of worthlessness and survivor guilt, as well as physical health and pain issues. (Id.)  Voss listed decreased sleep, daily nightmares, greatly diminished energy, shortness of breath, palpitations, numbness and tingling sensations, chills, stiffness, and pain up the back to the neck as concerns.  (Id. at 181.)  In May 2002, Voss submitted a Behavioral Healthcare Providers Outpatient Treatment Plan Summary, listing as treatment goals reducing Plaintiff's nightmares and helping him explore personal care assistant service options for his disabled wife.  (Id. at 176.)  Voss assigned Moua a Global Assessment of Functioning ("GAF") score of 60 in May 2002 (id.) and again in February 2003 (id. at 195).

In February 2003, Voss completed a Medical Impairment Questionnaire ("MIQ") regarding Moua.  In it, Voss indicated that Moua's symptoms of, inter alia, sleep disturbance, irritability, panic attacks, and difficulty concentrating, were largely related to PTSD and related anxiety.  (Id.)

Voss reported that Plaintiff was "oriented to person, place, and time, though with an underlying anxiety that intensifies into PTSD symptoms (including symptoms of panic) with certain precipitating stressors (often related to violence/talk of war)." (Id. at 196.)  Voss opined that when having PTSD and anxiety symptoms, Moua's memory and concentration would be significantly diminished and would interfere with detailed instructions and complicated routines.  (Id. at 198.)  Voss also indicated that Moua's impairments would cause him to be absent from work more than three times a month.  (Id. at 197.)

Citing the therapy records of Voss and the report by Dr. Barron, ALJ Herbert found that Moua was subject to a Section 12.04 affective disorder in the form of depression, a Section 12.06 anxiety-related disorder manifested as PTSD, and a Section 12.07 undifferentiated somatic disorder.  (Id. at 22.) The ALJ also found that the record evidence from October 2001 demonstrated that Moua had experienced moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and without any episodes of decompensation.  (Id.)  After discussing the level of daily activity and social functioning in which Moua engaged, the ALJ found Moua was no more than moderately limited by his mental impairments in these areas.  (Id. at 22-23.)

In also finding that Moua was moderately limited in his ability to maintain concentration, persistence, or pace (id. at 23), the ALJ noted the existence of the February 2003 MIQ in which Voss indicated that Moua had a marked limitation in concentration, persistence, or pace (id. at 199). The ALJ gave little weight to this opinion even though Voss was Moua's treating psychologist, finding it inconsistent with Voss's own psychotherapy treatment records and not supported by substantial evidence in the record. (Id. at 23.)

The ALJ specifically noted that Voss's assignment to Moua of a GAF of 60 (id. at 195) was internally inconsistent with Voss's conclusion in the same report that Moua exhibited marked limitation of function (id. at 199). (Id. at 23.) As noted by the ALJ, a GAF score of 51 to 60 denotes moderate symptoms rather than marked limitation. (Id.) The ALJ noted other inconsistencies in Voss's records, including that she had assessed Moua's attention and concentration as "good" (rather than "adequate" or "poor") in every psychotherapy treatment record (id. at 164, 167, 168, 169, 170, 172, 173, 174, 175, 177, 178, 179), but then claimed he exhibited a marked difficulty in maintaining concentration in the MIQ (id. at 199). (Id. at 23.) The ALJ also noted the lack of evidence of psychiatric hospitalizations or of periods in which Moua had been unable to function due to mental impairment, even though Voss asserted without explanation in the MIQ (id. at 199) that Moua

- 12 -

had experienced three episodes of decompensation, each of extended

duration.  (Id. at 23.)  ALJ Herbert also noted that Dr. Barron found Moua's

affective reactions to be normal with no obvious clinical or neurovegetative

symptoms like concentration difficulties.  (Id.)

Moua contends that the ALJ's decision to discount Voss's opinion

in the MIQ is reversible error because she was his treating psychologist for

nearly one year.  Although the Government failed to directly address this

contention, the Court finds that substantial evidence in the record supports

the ALJ's decision to give lessened weight to the opinions of psychologist Voss.

In short, the Court disagrees with Plaintiff's assertion that the underlying

Voss records are "extremely consistent" with the MIQ.  Rather, the ALJ aptly

described the above-noted substantial inconsistencies within the Voss

treatment evidence and also, secondarily, within the whole record.  Given the

inconsistencies, the Court finds that Voss's opinion is not controlling and was

properly weighed by ALJ Herbert.  See Singh, 222 F.3d at 452; Johnson, 87

F.3d at 1018.  Substantial evidence supports the ALJ's decision regarding the

evidence from psychologist Voss, and Moua's Motion should not be granted on

this basis.

Plaintiff also separately argues that the ALJ's treatment of a

September 2001 report by non-treating psychologist Michael Richardson

constitutes legal error.  Perhaps without an interpreter present (id. at 22,

130), Richardson administered the nonverbal subtests of the Wechsler Adult

Intelligence Scale - Third Edition, ["WAIS-III"], a series of standardized tests

used to evaluate cognitive and intellectual abilities.  Richardson found Moua

had an extremely low Performance IQ of 62, which, he noted, would exempt

Moua from employment.  (Id. at 131.)  Richardson also reported that Moua

had symptoms of PTSD, including difficulty sleeping, troublesome nightmares,

and the intrusive recollection of war scenes during the daytime.  (Id. at 132.)

Further, Richardson opined that "because of the nature of [Plaintiff's] cognitive

deficits and impact upon language development, academic skill acquisition

and the ability to perform even simple vocational activities," Moua was

"severely vocationally handicapped."  (Id. at 131-32.)  On the same page,

however, Richardson stated that Moua "could be considered a candidate for

competitive employment."  (Id. at 132.)  Richardson also encouraged Plaintiff

to make application to the SSA for a disability determination.  (Id. at 132,

133.)

        Dr. Barron noted that he reviewed Richardson's report, and

stressed that "these conclusions [regarding an IQ of 62] should be taken with

considerable caution since the Performance subtests of the WAIS-III are not

culturally fair, nor are they normed for non English speaking individuals."  (Id.

at 136.)  Based on the report by Dr. Barron (id.), the ALJ expressly determined that Richardson's conclusions that Moua suffered from significantly reduced cognitive ability and intellect were flawed, as they were based on inappropriate, biased testing instruments and were contrary to all other evidence regarding the relative intelligence and ability of Plaintiff.  (Id. at 21.)  The ALJ found that Richardson's determination that Moua was so cognitively deficient he should be per se exempted from work, yet should remain the primary caregiver for his disabled wife, "appears to be a sympathetic response to the claimant's life situation."  (Id. at 22.)  The ALJ noted that while also sympathetic to Moua's plight, "these are not factors that may be considered in a finding of disability."  (Id.)

Moua does not challenge the ALJ's disregard of Richardson's cognitive functioning opinion, but claims that the ALJ erred simply by not discussing Richardson's PTSD diagnosis.  (Pl.'s Mem. Supp. Mot. Summ. J. at 25.)  First, an ALJ is not required to discuss all the evidence.  Failing to cite specific evidence does not indicate that it was not considered; rather, it may indicate that it was considered and rejected where an ALJ explicitly considered other aspects of the same report.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).  Second, the Court is satisfied that the above-quoted language (R. at 22) and the ALJ's concern over Richardson's dubious testing strategy

(id. at 21) would sufficiently explain why the ALJ found Richardson's opinions to be not credible.  Id.; see also Stephens, 46 F.3d at 39; Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990) (reviewing court should defer to ALJ's credibility determinations if decision expressly discounts claimant's evidence and gives good reason to do so).  Moua's Motion should not be granted on this basis.

### B.    The ALJ's Mental Illness Determinations

Moua now contends that there is no substantial evidence in the record to support the ALJ's conclusion at step three of the sequential analysis that Moua's mental illness did not meet or equal the criteria Listings in 12.04, 12.06, or 12.07.  If an impairment exists that meet the description of a Listing or its equivalent, a claimant is deemed presumptively disabled.  Bowen, 482 U.S. at 141.  To prove equivalence, a claimant must show that his or her impairment meets all of the specified medical criteria.  Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  Importantly, the claimant carries the burden of proof through step four of the sequential analysis.  Singh, 222 F.3d at 451.

As stated above, ALJ Herbert found at step two that Moua exhibited a Section 12.04 affective disorder in the form of depression, a Section 12.06 anxiety-related disorder manifested as PTSD, and a Section 12.07 undifferentiated somatoform disorder.  (Id. at 22 (citing Voss therapy

records and Dr. Barron report).)  However, in reviewing Moua's functional

limitations at step three, the ALJ found that Moua's depression, PTSD, and

somatic dysfunction were not manifested to the degree required for Sections

12.04, 12.05, or 12.07 of the Listing of Impairments in Appendix 1 to Subpart

P of Regulation No. 4.  (Id. at 24).  Specifically, the ALJ found that Moua

exhibited a moderate restriction in activities of daily living; moderate

difficulties in maintaining social function; moderate difficulties in maintaining

concentration, persistence, or pace; and no episodes of decompensation.  (Id.

at 22.)  The Commissioner asserts that the ALJ properly considered the

documentary medical evidence and source opinions of record in finding that

Moua did not meet his burden of showing that he had an impairment that met

or medically equaled a Listing.  See 20 C.F.R. § 404.1526(b); SSR 96-6p.

To meet any of Listing 12.04, 12.06, or 12.07, Plaintiff had to

establish that he met the severity requirements or the degree of functional

loss for the Listing under either Paragraphs A and B or Paragraph C of the

regulation.  Plaintiff contends that he met the Paragraph B criteria of a

marked restrictions in all categories, and met the alternative Paragraph C

criteria in Listings 12.04 and 12.06.  Paragraph B criteria consist of: (1)

activities of daily living; (2) social functioning; (3) concentration, persistence,

or pace; and (4) episodes of decompensation, each of which areas are

particularly described in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).  The

first three criteria are judged using a five-point scale: non, mild, moderate,

marked, and extreme, whereas the last criterion is judged on a four-point

scale: none, one or two, three, four or more decompensation episodes.  20

C.F.R. § 416.920a(c)(4). Listings 12.04, 12.06, and 12.07 each require a

claimant to establish at least two of the following Paragraph B criteria: (1)

marked restriction of activities of daily living; (2) marked difficulties in

maintaining social functioning; (3) marked difficulties in maintaining

concentration, persistence, or pace; or (4) repeated episodes of compensation,

each of extended duration[1].  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04,

12.06, 12.07.  Paragraph C criteria are specifically discussed below in section

III.B.5.

### 1.    Paragraph B: Activities of Daily Living

Moua asserts that the testimony of himself and his son, and the

MIQ by psychologist Voss all demonstrate his marked deficiency in activities of

daily living.  At the February 2003 hearing, Plaintiff testified through an

interpreter that he felt mentally disabled due to "my brain or my blood or my

sickness," and that due to "depression" he could not sleep and felt sad.  (Id. at

---

[1] In the Listings, this means three episodes of decompensation within one year, or an average of once every four months, with each episode lasting for at least two weeks.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(4).

293.)  Moua also reported memory loss.  (Id.)  Describing a typical day, Moua

stated that he would wake, shower, clean up, and walk around the house,

with his primary responsibility to give medication to his wife.  (Id. at 296.)  He

testified that his children cooked, vacuumed, and took out the trash, mowed,

shoveled snow, and did laundry.  (Id. at 296-97.)  Moua testified that in the

past he did the household chores, but had stopped doing so.  (Id. at 297-98.)

He also stated that he could not sit for a long period of time due to the bullet

wound in his back.  (Id. at 296.)  Plaintiff also testified that he went to bed at

8:00 or 9:00 p.m. but would sleep for only a couple of hours, after which he

would wake and be unable to sleep again.  (Id. at 298.)  He said he was

haunted by his past and could not close his eyes during the day because of

memories.  (Id. at 299.)  Moua testified that his driving consisted of going

"around the block" and to the grocery store.  (Id. at 299-300.)  He noted that

he could not calculate what his change should be in the store.  (Id. at 300.)

Moua did not attend the Hmong soccer tournament or the Hmong New Year

celebration that year.  (Id.)  He testified that he had a couple of elderly friends

that would come and visit him, but that it was hard for him to visit them.  (Id.)

Plaintiff's adult son, Samuel, also testified at the hearing.  (Id. at

302.)  Samuel Moua lives with his parents, and stated that his father would

usually get up before 5:30 a.m. and sit on the couch or the floor of the home.

(Id. at 303.)  He said his father spent most of the day walking around the house or sitting.  (Id.)  He testified that since his father was hospitalized for chest pain in May 2001, he had stopped performing household chores.  (Id. at 304.)  Samuel Moua noted that he must do the family's paperwork.  (Id.)  He also testified that Plaintiff got anxious after hearing about the crash of the Columbia space shuttle and when hearing about war, and would repeat "the same thing" over and over.  (Id. at 305.)  He said his father was "always" complaining of chest pain, that he also complained of pain in his arm, back, and leg, and that his energy level was "usually really, really low."  (Id. at 305-06.)  He also testified that twice in the past couple of years Plaintiff had used a hunting rifle to threaten suicide in front of his family.  (Id. at 306.)

In the February 2003 MIQ, psychologist Voss noted that Moua's condition changed day to day, and that at times his mental abilities were, in some areas of capacity related to work, poor or non-existent.  (Id. at 197.)

However, the reports of Dr. Barron and Richardson each indicate a much broader range of daily activities after May 2001.  Although Richardson arguably attempted to secure benefits for Plaintiff by allegedly skewing testing results, even he noted in September 2001 that Moua was the primary caregiver for his disabled wife and their at-home children, and that he did the cooking, cleaning, and shopping, while assisting his wife with her basic needs.

(Id. at 132.)  In late December 2001, Plaintiff reported to Dr. Barron that he

made his own bed daily; bathed and changed his clothes without assistance;

washed dishes twice per day; dusted once per week; cleaned the floors two or

three times per month; did laundry once per week; drove daily to take his wife

to doctor's appointments or to go to the grocery store; managed his own

finances; watched television and listened to Hmong Radio Broadcasts;

sometimes went to the park and zoo; went to social gatherings and attended

church.  (Id. at 138.)  He reported that he did not shovel snow or mow the

lawn; garden, fish, or hunt; and did not go to that year's Hmong soccer

tournament or New Year celebration.  (Id.)

Plaintiff now urges the Court to ignore these reports of daily

activity on the basis that they are the possible result of flawed translation.

However, this Court must recommend that ALJ Herbert's decision that Moua

had not met his burden to show that his mental impairments resulted in

moderately restricted daily activities be upheld.  The decision was supported

by substantial evidence in the record.  Given obvious and understandable self-

interests, the testimonial evidence of the Moua family is not so persuasive that

it alters the substantiality of the medical evidence.  If the Commissioner's

decision is based on substantial evidence in the record, the Court may not

reverse it merely because other substantial evidence would have supported a

different outcome.  See Roberts, 222 F.3d at 468.  Hence, Plaintiff's Motion should not be granted on this basis.

### 2.      Paragraph B: Social Functioning

Moua contends that he proved deficiency in a second Paragraph B factor, social functioning.  However, Plaintiff admits that the record shows that he gets along well with his spouse and children.  (Pl.'s Mem. Supp. Mot. Summ. J. at 28.)  He argues, without any citation whatsoever, that the record and hearing testimony nonetheless showed "extreme isolation" and a significant lack of social activities such that he had at least a moderate restriction on social functioning.  (Id.)  The Court easily finds that Moua failed to satisfy his burden of proving a marked restriction in social functioning.

### 3.      Paragraph B: Concentration, Persistence, or Pace

In asserting that he proved a marked diminishment in maintaining concentration, persistence, or pace, Plaintiff relies on the MIQ by psychologist Voss.  (Pl.'s Mem. Supp. Mot. Summ. J. at 29-30.)  As discussed in section III.A., above, the Court finds that the ALJ's assessment that Voss's conclusions in the MIQ regarding concentration were inconsistent and flawed, was a proper one supported by substantial evidence in the record.  Hence, the Court need not repeat itself here.  Moua's Motion should not be granted on this basis.

### 4.    **Paragraph B: Episodes of Decompensation**

The regulations define episodes of decompensation as

"exacerbations or temporary increases in symptoms or signs accompanied by a

loss of adaptive functioning, as manifested by difficulties in performing

activities of daily living, maintaining social relationships, or maintaining

concentration, persistence, or pace."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.00C(4).  Episodes "may be inferred from medical records showing

significant alteration in medication; or documentation of the need for a more

structured psychological support system (e.g., hospitalizations, placement in a

halfway house, or a highly structured and directing household); or other

relevant information in the record about the existence, severity, and duration

of the episode."  Id. (parenthetical in original).  As noted in section III.A.,

above, the ALJ discounted psychologist Voss's indication on the MIQ that

Moua had experienced three episodes of decompensation, each of extended

duration, that is, more than two weeks.

The Court finds that the ALJ's decision to find that information

less than credible was supported by substantial evidence, as there is no record

evidence of any period of decompensation as such episodes are described in

the regulation.  Plaintiff's argument that persons like Moua may be nursed at

home by their extended families does not overcome the utter lack of record

evidence of such episodes other than the single, conclusory notation by Voss. As with the other Paragraph B determinations, the ALJ's decision should be upheld.

**5.    Paragraph C Criteria for Listings 12.04 and 12.06**

Alternatively, a claimant may prove that he meets or medically equals a Listing via Paragraph C.  In Listing 12.04 for depression, Moua would have to show a medically documented history of a chronic affective disorder of at least two years' duration that had caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, in addition to either (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process where even a minimal increase in mental demands or change in environment would be predicted to cause an individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supporting living arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04C.  A lack of evidence of ongoing treatment for depression supports a determination that a claimant did not meet the Listing.  See Holland v. Apfel, 153 F.3d 620, 622 (8th Cir. 1998).  As for PTSD, Listing 12.06, Paragraph C would require Moua to prove up Paragraph A, regarding medically documented findings of PTSD,

and also to demonstrate that his PTSD has resulted in a "complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06C.

Plaintiff argues, without a single cite to the record, that the record and testimony evidence established the existence of chronic depression for at least two years that caused more than a minimal limitation in his ability to do basic work, and established repeated episodes of decompensation, each of extended duration, satisfying Listing 12.04C.  (Pl.'s Mem. Supp. Mot. Summ. J. at 31.)  Moua also claims, again without any citation to the record, that the record and testimony evidence established that his PTSD resulted in a complete inability to function independently outside the home, satisfying Listing 12.06C.  (Id.)

The Court finds that Moua has not met his burden to prove that any episodes of extended-duration decompensation occurred, nor that his PTSD has resulted in a "complete inability" to function independently outside the home.  Rather, the substantial record evidence reveals tends toward the opposite conclusions.  This Court cannot say that the ALJ's decisions in this regard were not supported by substantial evidence, and recommends that the decisions be upheld.

### C.    ALJ's Conclusions Regarding Moua's RFC

Plaintiff asserts that the ALJ's RFC conclusion constitutes legal error.  VE Norman Mastbaum testified at the hearing, and the ALJ posed two hypothetical questions.  In the first, he asked the VE to consider an individual of Plaintiff's age, education and previous work experience, limited to a medium exertional level and relatively simple, unskilled jobs, with limited contact with supervisors, co-workers and the public.  (R. at 309-10.)  The VE responded that such a person could perform the jobs of "unscrambler" (a machine tending job within the beverage and food industry), press tender (either within the plastic industry or the rubber industry), and machine tender (within the machine shop industry).  (Id. at 310-11.)

As a variation, the ALJ asked the VE to assume that the hypothetical individual's concentration, persistence, or pace was severely impaired due to PTSD.  (Id. at 311.)  The VE responded that if the individual was severely impaired in such a way, he or she would be unemployable.  (Id.)  Additionally, the ALJ inquired whether the jobs cited under the first hypothetical would be available to a person not fluent in the English language, to which the VE replied affirmatively.  (Id.)  In response to questioning by Plaintiff's attorney, the VE further opined that the first hypothetical person would be unemployable if he or she were absent more than three times a month.  (Id. at 313.)

At stated above, the ALJ ultimately concluded that Moua retained the RFC for "relatively simple unskilled jobs that are routine and repetitive without frequent changes in directions or duties, without high or demanding production goals, without likely involvement in challenging or dangerous situations, and involve limited brief and superficial contact with supervisors, co-workers and the public." (Id. at 24.)  RFC has been defined as "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Douglas v. Bowen, 836 F.2d 392, 396 (8th Cir. 1987).  It is the claimant's burden to prove his or her RFC.  Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995).  Relatedly, testimony from a VE based on a proper hypothetical constitutes substantial evidence.  Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

Moua now contends that given his age, inability to communicate in English, lack of past relevant work experience, and the severity of his depressive and PTSD symptoms, there were no jobs in the economy that he could actually perform.  He points to the VE's testimony regarding absences, and urges the Court to defer to psychologist Voss's notation in the MIQ (id. at 197) that Moua would likely miss work more than three days a month due to his mental impairments or treatments.

The Court finds that the ALJ's RFC decisions regarding Moua's age, language abilities, and past work experience were supported by substantial evidence, as the VE specifically found that those factors would not prevent Moua from working at the listed jobs, and that expert testimony is uncontroverted. While the question of absences from work is a closer one, the Court finds that substantial evidence in the whole record supports the ALJ's conclusion on this matter. For example, Plaintiff has pointed to no record evidence regarding periods of decompensation of any duration, and the ALJ found that there were none. There is no evidence of mental health related hospitalizations or frequent visits to mental health professionals. Hence, the Court recommends that while substantial evidence may have supported a different conclusion, the one reached by the ALJ should be upheld.

### D.   ALJ's Finding of Non-Disability Under the Grid

Where a claimant has a severe medically determinable physical or mental impairment but is not engaging in substantial gainful activity and his or her impairments prevent the performance of vocationally relevant past work, the case is evaluated pursuant to the Medical-Vocational Grid Rules. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00. Moua argues that he should have been considered disabled because he could not return to his prior work (he had none) and he was unable to engage in other work at a medium exertional

level.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.09.  Medium work

involves lifting no more than fifty pounds occasionally and twenty-five pounds

frequently.  20 C.F.R. § 404.1567(c).

The record reflects that Plaintiff sought chiropractic treatment

from April 2002 to February 2003.  (R. 205-38.)  Chiropractic records are not

considered medical evidence from "acceptable sources," but do qualify as

medical evidence from "other sources," on which an ALJ may rely for evidence

of the severity of an impairment.  20 C.F.R. § 416.913.  Here, chiropractor

Steven Schumacher, D.C., completed an Evaluation for Work Capacity form in

May 2002, listing Plaintiff's diagnoses as latent/effect cervical sprain-strain;

cervical, thoracic and lumbar myalgia, associated with cephalgia [headaches];

laxity at ligaments; cervicalgia; thoracic and lumbar pain.  (<u>Id.</u> at 250.)  In an

attached letter, Schumacher opined that Plaintiff "could attempt to perform

some type of part-time work with lifting restrictions of no more than 15

[pounds] on an occasional basis."  (<u>Id.</u>)  Moreover, Schumacher stated that

Moua "should have the ability to change positions during his workday; i.e.,

standing to sitting, sitting to standing, walking about as needed."  (<u>Id.</u>)  He

added that Plaintiff should seek employment that does not require him to

perform frequent bending or twisting of his back.  (<u>Id.</u>)

There is also acceptable source medical evidence in the record

related to Moua's physical limitations.  In May 2001, Plaintiff underwent a

cardiology consultation and physical examination after being admitted with

complaints of chest pain, on and off for several days, increasing in frequency.

(<u>Id.</u> at 121, 124.)  Moua also complained of a one-week history of

lightheadedness and left anterior chest pain or tightness, denying any

nausea, vomiting, shortness of breath, diaphoresis, trauma, fevers, or chills.

(<u>Id.</u> at 121.)  According to Samuel Moua, Plaintiff was under stress, as his wife

had been recently admitted to the hospital.  (<u>Id.</u>)  Plaintiff's son also reported

that Moua had been walking and doing some light chores around the house

and yard, and that these chores did not seem to aggravate his pain.  (<u>Id.</u>)

          Moua's chest was clear to auscultation, without rales, rhonchi, or

wheezing, and his heart rate had a regular rate and rhythm, without

"murmurs, rubs, or gallops."  (<u>Id.</u> at 124.)  An electrocardiogram showed

normal sinus rhythm.  (<u>Id.</u> at 118, 125.)  An x-ray of Plaintiff's chest revealed

questionable borderline cardiomegaly and minimal left lower lobe atelectasis,

a collapsed or airless condition of the heart.  Otherwise, no acute disease was

seen.  (<u>Id.</u> at 125-26, 128-29.)  Plaintiff had no residual weakness or other

abnormalities from his war injuries.  (<u>Id.</u> at 121.)

          At a follow up cardiology consultation, Moua reported that for the

prior two weeks he had intermittent localized left-sided chest discomfort that

was nonexertional in nature.  (Id. at 119.)  He could exercise without worsening the pain, and his initial electrocardiogram and enzymes were normal.  (Id.)  His lungs were clear to auscultation and percussion, and he had normal heart sounds and no clear evidence of murmurs or rubs.  (Id. at 120.)  Plaintiff's femoral pulses were intact, his distal pulses were full and symmetrical, and no peripheral edema was evident.  (Id.)  Neurologically, he was grossly intact.  (Id.)  A follow-up chest x-ray taken two days after his admittance showed a minor pleural thickening on the left.  (Id. at 129.)  However, the atelectasis in the left lower lobe had resolved and the mediastinum was normal.  (Id.)  Days later, tests revealed that Plaintiff's left ventricle was within normal size limits, and that overall left ventricular systolic function appeared well-preserved.  (Id. at 116.)  There were no discrete regional wall abnormalities present, and all other chambers were within normal size limits although the aortic valve leaflets were sclerotic.  (Id.)  A mild aortic insufficiency was present, as well as mild mitral and tricuspid insufficiency.  (Id. at 116-17.)

In September 2001, Plaintiff presented to a clinic with complaints of chest pain, stating that the pain was often constant all day long and had been occurring for several months.  (Id. at 135.)  He stated that Advil helped but did not resolve the pain.  (Id.)  Moua noted that he had no problems

breathing or exercising, and that sometimes exercise even improved the pain. (<u>Id.</u>)  Upon examination, Thomas Field, M.D., reported that Plaintiff's lungs were clear bilaterally, and his heart had a regular rate and rhythm without murmur.  (<u>Id.</u>)  Dr. Field concluded that Moua's chest pain was "probably chest wall pain or anxiety."  (<u>Id.</u>)  Dr. Field instructed Plaintiff to continue to use Advil.  (<u>Id.</u>)

At the hearing, the ALJ called upon Alexander Webb, M.D., as a neutral ME.  Before asking Dr. Webb to opine as to Plaintiff's physical limitations for work, the ALJ explicitly explained that the present case was one where the Medical-Vocational Grid profile would direct a favorable result for Plaintiff if he were limited to light work or sedentary work, and an unfavorable result for Plaintiff if he could perform medium work.  (<u>Id.</u> at 294.) Dr. Webb pointed to the medical evaluations from May 2001, which found Plaintiff to be physically normal with no evidence of heart disease or major problems with his war wounds.  (<u>Id.</u> at 295.)  Dr. Webb stated, "I don't find any, any physical impairment."  (<u>Id.</u>)  Dr. Webb then answered the ALJ that he found nothing that would significantly affect Moua's exertional limitations. (<u>Id.</u>)

Based on the expert testimony by Dr. Webb, supported by the medical evidence of record from May and September 2001 recounted above,

the Court finds that substantial evidence in the record supported the ALJ's

determination that Plaintiff retained the RFC to perform medium work.

Substantial evidence in the whole record shows that Plaintiff did not meet his

burden of proving a more restricted RFC.  Accordingly, the Commissioner's

decision should be affirmed in this regard.


In sum, the Court recommends that Plaintiff has shown no

grounds for reversal or remand of the Commissioner's final decision of non-

disability.  Based on the foregoing, and all the files, records, and proceeding

herein, **IT IS HEREBY RECOMMENDED**:

(1)     Plaintiff Xai Bee Moua's Motion for Summary Judgment

(Doc. No. 10) should be **DENIED**;

(2)     Defendant Commissioner's Motion for Summary Judgment

(Doc. No. 17) should be **GRANTED**; and

(3)     The Commissioner's decision should be **AFFIRMED**.


Dated: June 14, 2005

 s/ Jonathan Lebedoff
JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by July 2, 2005, a copy of specific, written objections.  A party may respond to the objections within ten days after service thereof.  All objections and responses filed under this rule shall not exceed 3,500 words.  A District Judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.